AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
Dec 09 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

| | |
|---|---|
| United States of America<br>v.<br>GUSTABO ALFONSO RAMOS<br><br>*Defendant(s)* | )<br>)<br>) Case No. 3-20-mj-71799 MAG<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  October 8, 2020  in the county of  San Francisco  in the
Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of controlled substances<br><br>Penalties: Maximum 20 years' imprisonment, 3 years to lifetime of supervised release, $1,000,000 fine, $100 special assessment, forfeiture |

This criminal complaint is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

Approved as to form  */s/ Yoosun Koh*
AUSA Yoosun Koh

/s/ David Peacock
*Complainant's signature*

David Peacock, Special Agent, FBI
*Printed name and title*

Sworn to before me by telephone.

Date:  December 9, 2020

*Judge's signature*

City and state:  San Francisco, CA          Hon. Jacqueline S. Corley, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, David Peacock, Special Agent of the Federal Bureau of Investigation, having been duly sworn, do declare and state:

## INTRODUCTION

1. This Affidavit is made in support of an application for a criminal complaint against, and arrest warrant authorizing the arrest of, Gustabo Alfonso RAMOS, also known as WILLIAM (hereinafter "**WILLIAM**" or "**RAMOS**") for knowingly distributing a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C), on or about October 8, 2020, in the Northern District of California.

2. The facts set forth in this Affidavit are based on my personal knowledge, training and experience, information I obtained from other individuals during my participation in this investigation (including other law enforcement officers), my review of reports prepared by other law enforcement officers and records prepared by others, and communications with others who have personal knowledge of the facts and the circumstances described herein (including conversations with other law enforcement officers and a Cooperating Witness involved in this investigation). Where I refer to conversations and events, I often refer to them in substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted. Because this Affidavit is submitted for the limited purpose of obtaining an arrest warrant, I have not included each and every fact known to me that supports probable cause for arrest. Rather, I have set forth only the facts that I believe are necessary to support the lawful arrest of the individual listed in this Affidavit. This Affidavit also reflects my current understanding of facts relating to this

1

investigation, but my understanding may change in the future as the investigation proceeds.

## AFFIANT BACKGROUND

3.I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516, including violations of 21 U.S.C. § 841(a)(1).

4.I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since October 2014.  I am currently assigned to the San Francisco Field Division in California.

5.I successfully completed a five month FBI New Agent Training Academy at the FBI Academy in Quantico, Virginia.  This training included instruction in the investigation of federal drug violations, including, but not limited to Title 21, United States Code Sections 841 and 846.  Additionally, this training included several hundred hours of comprehensive, formalized instruction in, but not limited to, narcotics investigations, drug identification, detection, interdiction, financial investigations and money laundering, identification and seizure of drug related assets, undercover operations, and electronic and physical surveillance procedures.

6.During the course of my employment as a FBI Special Agent, I have participated in numerous investigations either as a case agent or in a supporting role.  I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations.  I also have participated in many aspects of drug investigations including, but not limited to, undercover operations, telephone toll analysis, and records

research, physical and electronic surveillance. I have participated in the execution of several federal and state narcotics search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics.

7. I have conducted and been involved in narcotics and financial investigations regarding the unlawful manufacture, possession, distribution, and transportation of controlled substances, as well as related money laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics. In the course of these investigations, I have investigated crimes in violation of Title 21, United States Code, Sections 841, 843, and 846, and Title 18, United States Code, Sections 1956 and 1957.

8. I have participated in two Organized Crime Drug Enforcement Task Force ("OCDETF") investigations. The OCDETF program is part of the United States Attorney General's strategy to reduce the availability of drugs by disrupting major trafficking organizations through joint collaborations across agencies. I have monitored, supervised, conducted surveillance, or otherwise participated in several investigations that utilized electronic interceptions. In the course of working on investigations using electronic interceptions, I have monitored and reviewed transcripts and/or "line sheets" of intercepted conversations, much of which employed some form of code to thwart law enforcement.

9. Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of vehicles, mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of numerical codes and code words to conduct business. Also, I have become familiar with narcotics traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and

transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds. Furthermore, I have investigated cases involving the darknet, its vendors, and how those vendors utilize encrypted communication and the U.S. Postal Service to distribute narcotics.

10. Over the past year, I have worked with other experienced agents, law enforcement officers and prosecutors on cases that apply the use of electronic surveillance to investigating defendants who are trafficking narcotics internationally and/or across multiple jurisdictions within the United States.

## APPLICABLE LAW

11. Title 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) prohibits a person from knowingly or intentionally distributing a schedule II controlled substance, including fentanyl.

## FACTS ESTABLISHING PROBABLE CAUSE

12. On or about September 29, 2020, after an extensive investigation into a San Francisco-based darknet narcotics vendor, FBI San Francisco agents executed an arrest and search warrant operation in San Francisco, California. Agents identified and arrested an individual, hereafter Cooperating Witness ("CW")[1], on distribution and conspiracy charges

---

[1] The CW has been charged with distribution of a controlled substance in the Northern District of California. The CW is working with federal law enforcement for the purpose of seeking consideration in his/her federal case. The CW is not receiving monetary compensation for his/her assistance. The information provided by the CW, to date, has been found to be trustworthy and credible and much of it has been corroborated. The CW has two or three misdemeanor convictions for DUI-related offenses and a felony conviction for failure to stop at the scene of a collision involving personal injury or death. The CW was sentenced to 60 months' probation and a suspended jail sentence for the felony conviction. I believe that the CW failed to appear in connection with the hit-and-run case and violated the terms of his probation by moving residences without first notifying his/her probation officer. The CS has previous arrests for various offenses, including but not limited to the following: assault with a deadly weapon that is not a firearm (charge dismissed), battery (charge dismissed), fighting in a public place (charge dismissed), violation of probation, DUI, driving with a suspended license, and drugs possession (charge dismissed). The CW has been detained without arrest (Pros Rel – Det Only – Interest of Justice) for false personation,

related to the sale of fentanyl on the darknet. CW admitted to purchasing fentanyl from a source of supply ("SOS") named "Carlos" who sold fentanyl in the Tenderloin neighborhood of San Francisco. During his/her custodial interview, CW admitted that he/she had planned to meet with Carlos that evening, September 29, 2020, in order to purchase fentanyl.

13.   On or about September 29, 2020, at the direction of federal agents, CW sent a text message to Carlos in order to coordinate a purchase of fentanyl. CW and Carlos exchanged text messages in which they agreed to meet in the Tenderloin that evening and Carlos agreed to sell six ounces of narcotics (in this case fentanyl) to CW for $6,000. That evening, FBI agents used CW to conduct a controlled buy/walk operation in the Tenderloin. Agents conducted surveillance of two separate narcotics transactions between CW and an individual whom CW later identified to agents as Carlos. In total, CW purchased from Carlos four bags of a white powdery substance weighing approximately 170 grams. The suspected narcotics were later tested using a TruNarc machine, and all four bags of the white powdery substance tested presumptively positive for fentanyl.

14.   On or about September 30, 2020, FBI agents met with CW again to develop more information regarding CW's second SOS, an individual whom CW referred to as "William" Last Name Unknown ("LNU") ("**WILLIAM**"). CW told agents that he/she had purchased fentanyl from **WILLIAM** in the past. He/she also said that **WILLIAM** could be found dealing drugs nearly every night in the Tenderloin and that **WILLIAM** sold fentanyl, cocaine, and methamphetamine in quantities as large as kilograms. CW stated that he/she contacted **WILLIAM** via text when CW wanted to meet in the Tenderloin to purchase fentanyl. **WILLIAM** appeared in CW's cell phone contact list under the name, "William Stop Changing

---

disobeying a court order, giving a false ID to peace officers, and providing false information to peace officers

5

Phones," telephone number XXX-XXX-3639 ("**Target Telephone 1**").

15. On October 7, 2020, at the direction of federal agents, CW sent a text to **WILLIAM** to coordinate the purchase of fentanyl on the evening of October 8, 2020. The text messages between CW and **WILLIAM** are transcribed below.

> CW: Yo what's up are you going to be around tomorrow?
>
> WILLIAM: What time do you want me to spend leaving you 4 meals today
>
> CW: Yo
> Didn't you say 7?
>
> WILLIAM: If you want, I can go right now
>
> CW: No 7 is fine I am running errands and wont be able to meet you until then
>
> WILLIAM: 4 times 3900
> you owe me $ 500 do you remember
>
> CW: Oh ok
> No problem
>
> WILLIAM: Ok
>
> CW: I'll get you the difference net time we meet I can't pull out any more money today
> *Next

16. I know from my training and experience that when **WILLIAM** texted CW that he would be "leaving 4 meals today," **WILLIAM** was telling CW that he would have 4 ounces of narcotics (in this case fentanyl) for CW that evening. Additionally, when WILLIAM texted "4 times 3900," he was telling CW that the cost of four ounces of narcotics would be $3,900. As detailed below, CW utilimately paid **WILLIAM** $4,000 for the drugs.

17. On or about the evening of October 8, 2020, FBI agents used CW to execute a controlled purchase of fentanyl from **WILLIAM** in the Tenderloin. Agents provided CW with $4,000 and instructions to purchase four ounces of fentanyl from **WILLIAM**. They also fitted

6

CW with an audio and video recording device, which recorded the transaction between CW and **WILLIAM**.[2] Agents conducted physical surveillance near the corner of Franklin Street and Golden Gate Avenue in San Francisco. They observed a dark-colored Nissan sedan, California license plate XXXX367, arrive in the vicinity of Golden Gate Avenue and Franklin Street. Agents observed CW getting into the Nissan sedan. CW confirmed later that the driver of the Nissan sedan was **WILLIAM** and that he purchased four ounces of fentanyl from **WILLIAM** in exchange for $4,000. CW also said that **WILLIAM** had driven the same Nissan sedan on multiple occasions when CW had purchased narcotics from him in the past. CW relinquished to agents approximately 114.3 grams of a white powdery substance. The suspected narcotics tested presumptively positive for fentanyl using a TruNarc instrument.

18.  A subsequent registration check with the California Department of Motor Vehicles revealed that the Nissan sedan, California license plate XXXX367, is registered to an individual named "Luis Angel Cuevas." No California driver license or identification card information was on file for Cuevas. However, the vehicle registration is associated with three different addresses located in Oakland, California, the second of which is the address of an apartment on Loma Vista Avenue, Oakland, California.

19.  On or about October 15, 2020, the Honorable Joseph C. Spero, Chief U.S. Magistrate Judge for the Northern District of California, issued a search warrant authorizing the government to obtain for a period of 30 days the cell site location information associated with **Target Telephone 1**, which is the number for **WILLIAM** provided by CW. On or about October 19, 2020, the warrant was served upon T-Mobile, the service provider for **Target**

---

[2] I have reviewed the recording of this transaction. The audio is clear, and the video shows CW getting into the car, but based on the position of the camera, does not clearly show **WILLIAM** during the transaction.

7

**Telephone 1**. On October 21, 2020, FBI agents began receiving location information for the cell phone associated with **Target Telephone 1**. Among other things, location monitoring of the cell phone believed to be utilized by **WILLIAM** showed that the device was regularly located within 900 meters of 35th Avenue and MacArthur Boulevard in Oakland, California. The apartment on Loma Vista Avenue, Oakland, California, where **WILLIAM** is believed to reside, is located approximately 800 meters from the ping location. The intelligence gathered from location monitoring of the cell also corroborates FBI agents' physical surveillance of **WILLIAM** at this address.

20.  On or about October 22, 2020, FBI agents conducted physical surveillance of the residence on Loma Vista Avenue, Oakland, California. Agents located the known Nissan sedan, California license plate XXXX367, parked in a numbered parking space in the garage under the residence.

21.  On or about October 26, 2020, agents once again conducted physical surveillance at the address on Loma Vista Avenue, Oakland, California. Agents observed an Unknown Male ("UM") depart a specific apartment on Loma Vista Avenue, access the building's garage, and depart in the Nissan. Agents later photographed UM, and CW confirmed that UM was **WILLIAM**, the same individual CW had purchased narcotics from on several occasions, including the purchase witnessed by agents on or about the evening of October 8, 2020.

22.  On or about the evening of October 26, 2020, agents followed **WILLIAM**, who was driving the Nissan, from Oakland northwest towards San Rafael, California. Agents witnessed **WILLIAM** as he crashed the Nissan into a stalled vehicle on the Richmond-San Rafael Bridge. **WILLIAM** then placed the vehicle in reverse and impacted a second vehicle while attempting to flee the accident scene. Agents observed **WILLIAM** as he traveled

8

westbound on Interstate-580 and exited onto Andersen Drive in San Rafael, where he was stopped by the driver of the second vehicle he had impacted.  Agents contacted the California Highway Patrol and two officers were dispatched to the scene. Within minutes of stopping on Andersen Drive, **WILLIAM** retrieved a backpack from the Nissan and fled the scene on foot, abandoning his vehicle.  Officers of the California Highway Patrol searched the abandoned vehicle and found narcotics paraphernalia and indicia in the front seat.

23.    On or about October 27, 2020, the day after the accident, agents conducted surveillance at the address on Loma Vista Avenue, Oakland, California and observed **WILLIAM** as he exited the same apartment on Loma Vista Avenue that they had observed him exiting the previous day, October 26, 2020, and entered the driver's seat of a black Volkswagen CC sedan, California license plate XXXX737.  Agents have observed **WILLIAM** entering and departing this apartment and operating the Volkswagen on multiple other occasions.

24.    On or about November 13, 2020, Agents conducted physical surveillance at the address on Loma Vista Avenue, Oakland, California.  Agents observed the Volkswagen parked in a numbered parking space in the parking garage of the address on Loma Vista Avenue, the same parking space previously utilized by **WILLIAM** to park his Nissan prior to the accident on October 26, 2020.

25.    On or about December 7, 2020, agents conducted physical surveillance at the address on Loma Vista Avenue, Oakland, California.  At approximately 3:54 PM, they saw **WILLIAM** and an individual matching Carlos's description walking on Loma Vista Avenue and then to the residence on the same street.  They observed **WILLIAM** open the front door of the apartment at which he had been previously observed and both individuals went inside the residence together.  At approximately 4: 21 PM, **WILLIAM** exited the apartment and walked on

Loma Vista Avenue.

26. On November 10, 2020, federal Agents shared surveillance photos of **WILLIAM** with officers of the San Francisco Police Department ("SFPD"), Tenderloin Station. SFPD officers positively identified **WILLIAM** as Gustabo Alfonso **RAMOS**, a/k/a Gustabo Adolfo Ramos Hernandez, a/k/a Carlos Cuevas-Ramos. According to SFPD, **RAMOS** had been arrested three times in San Francisco on charges related to narcotics possession with intent to distribute. During two of the arrests, **RAMOS** resisted police officers, and on one occasion he assaulted an officer. According to law enforcement records, **RAMOS** has two pending felony warrants for his arrest in San Francisco. A booking photo of **RAMOS** is shown below.



27. On the evening of December 6, 2020, CW positively identified **RAMOS** a/k/a **WILLIAM** in the Tenderloin neighborhood of San Francisco. During their in-person meeting, **RAMOS** provided CW with his new telephone number, XXX-XXX-6526 ("**Target Telephone 2**"). Later that evening, CW initiated a text conversation with **RAMOS** to coordinate the purchase of narcotics on December 7, 2020. The text messages between CW and **RAMOS** are

10

transcribed below.

> CW: Yo so what's the best deal you can give me and what colors of fett?  I am only able to pull together $3000
>
> WILLIAM: I'm going to give you 28 grams of green and 66 grams of yellow.  It's a good price I'm giving you.
>
> CW: Ok that's fine you want to meet at the same spot we normally meet at ?
>
> WILLIAM: Yes it is fine to the same place as always.

28. Based on my training and experience, I know that drug traffickers frequently change phone numbers to facilitate illicit activity and avoid detection by law enforcement.  I also know, based on my training and experience, that when CW wrote "fett" he/she was referring to fentanyl and when **WILLIAM** texted, "I'm going to give you 28 grams of green and 66 grams of yellow," he was referring to the different colors of fentanyl.  Fentanyl is a schedule II controlled substance.

### REQUEST TO SEAL AFFIDAVIT, CRIMINAL COMPLAINT, AND ARREST WARRANT

29. Based on my training and experience, the disclosure of the existence of this affidavit, the complaint, the arrest warrant, and related documents may cause **RAMOS** or other co-conspirators, known and unknown at this time, to destroy evidence or flee to evade arrest.  I therefore request that the Court seal this affidavit, the complaint, the arrest warrant, and related documents.

### CONCLUSION

30. Based on the foregoing evidence, and my training and experience, I conclude that there is probable cause to believe that on or about October 8, 2020, in the Northern District of California, Gustabo Alfonso **RAMOS** knowingly distributed a controlled substance, specifically

fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C). I therefore request that the Court issue a criminal complaint and arrest warrant for **RAMOS**.

I declare, under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge and belief.

_____/s/_____
David Peacock
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P. 4.1 and 4(d) on this 9th day of December 2020. This application and warrant are to be filed under seal.

_____
THE HONORABLE JACQUELINE S. CORLEY
UNITED STATES MAGISTRATE JUDGE

12