DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

YOOSUN KOH (NYBN 5245220)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7034
    FAX: (415) 436-7234
    Yoosun.Koh@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 3:20-MJ-71799 MAG |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION TO DETAIN** |
| v. | |
| GUSTABO RAMOS, | Date: December 22, 2020<br>Time: 10:30 a.m. |
| Defendants. | Judge: Hon. Laurel Beeler |

    On December 10, 2020, Gustabo Ramos was arrested at his home with approximately 380 grams of fentanyl, 240 grams of methamphetamine, and an AR-15 style ghost rifle that had been modified into a 7.42 semi-automatic assault weapon with two loaded magazines. On the previous day, the United States Attorney's Office had filed a criminal complaint charging Ramos with distribution of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C). At Ramos's initial appearance on December 11, 2020, the government moved for detention on the grounds that he is both a flight risk and danger to the community, pursuant to 18 U.S.C. § 3142. The government now supplements its motion for Ramos's detention with this written

motion.

As described further below, the defendant is a dangerous drug-trafficker who is known to sell fentanyl, cocaine, and methamphetamine in quantities as large as pounds and kilograms in the Tenderloin neighborhood of San Francisco. In addition to the drugs that FBI agents seized from Ramos's home, the defendant is responsible for at least another half-pound of fentanyl based on two sales to a Cooperating Witness ("CW"). These are significant quantities of fentanyl that make the defendant more dangerous than most of the street-level drug-dealers in the Tenderloin. Furthermore, the defendant is not your average low-level dealer who has been brought in on his first drug-related arrest. The defendant's criminal history reveals that he has been arrested no fewer than *13 times* on charges related to drug trafficking, disobeying court orders, and resisting/obstructing a public officer, since he entered the country illegally in May 2018.

The defendant's prolific drug trafficking activities, his illegal possession of a semi-automatic firearm, and his record of disobeying court orders and obstructing/resisting law enforcement officers demonstrate that no condition or combination of conditions can reasonably assure the safety of the community or the defendant's future appearance in court. Accordingly, the Court should order Ramos detained pending trial.

## I.   BACKGROUND

### A.   Offense Conduct

#### 1.   Defendant Sold Eight Ounces of Fentanyl to a CW

As further described in Federal Bureau of Investigation ("FBI") Special Agent David Peacock's affidavit in support of the criminal complaint, FBI used a CW, whose information has been found to be trustworthy, credible, and corroborated by independent investigation, to conduct two controlled purchases of fentanyl in the Tenderloin. The CW told agents that he/she had purchased fentanyl from an individual whom he/she referred to as "William" Last Name Unknown in the past. The individual referred to as "William" was later determined to be Gustabo Ramos.[1] The CW also said that Ramos

---

[1] On November 10, 2020, federal agents shared surveillance photos of William with officers of the San Francisco Police Department ("SFPD"), Tenderloin Station. SFPD officers positively identified William as Gustabo Alfonso Ramos, the individual charged in the complaint. To avoid confusion, the remainder of this memorandum refers to William as Gustabo Ramos.

could be found dealing drugs nearly every night in the Tenderloin and that Ramos sold fentanyl, cocaine, and methamphetamine in quantities as large as kilograms. CW stated that he/she contacted Ramos via text when CW wanted to meet in the Tenderloin to purchase fentanyl.

On October 7, 2020, at the direction of federal agents, CW sent a text message to Ramos to coordinate the purchase of fentanyl on the evening of October 8, 2020. The following day, FBI agents used CW to execute a controlled purchase of fentanyl from Ramos in the Tenderloin. Agents conducted physical surveillance near the street corner where CW and Ramos had agreed to make the drug transaction. They observed a dark-colored Nissan sedan arrive in the vicinity, and then saw CW getting into the vehicle. CW confirmed later that the driver of the Nissan sedan was Ramos and that he/she purchased four ounces of fentanyl from Ramos in exchange for $4,000. CW relinquished to agents approximately four ounces (114.3 grams) of a white powdery substance. The suspected narcotics tested presumptively positive for fentanyl using a TruNarc instrument.

On the evening of December 6, 2020, CW positively identified Ramos in the Tenderloin neighborhood. During their in-person meeting, Ramos provided CW with his new telephone number. Later that evening, CW initiated a text conversation with Ramos to coordinate the purchase of narcotics on December 7, 2020. On or about the evening of December 7, 2020, Ramos met with CW in the Tenderloin and sold to CW approximately for ounces (114 grams) of fentanyl in exchange for $3,000. CW relinquished to FBI agents, who conducted physical surveillance during the transaction, two plastic bags containing the suspected fentanyl. A TruNarc test revealed that the substances tested presumptively positive for fentanyl.

Across the two controlled purchased on or about October 8, 2020 and December 7, 2020, Ramos distributed approximately half a pound of fentanyl. The first controlled purchase on or about October 8, 2020 forms the basis of the complaint.

    2. <u>Law Enforcement Seized Fentanyl, Methamphetamine, and an AR-15-style Ghost Rifle from Defendant's Home</u>

On December 9, 2020, the Honorable Jacqueline S. Corley, U.S. Magistrate Judge for the Northern District of California, issued a complaint against, and arrest warrant authorizing the arrest of,

Ramos, along with a warrant to search his residence, person, and vehicle for drugs and other evidence, fruits, and/or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846. FBI agents executed the warrants on December 10, 2020 at Ramos's residence in Oakland, California. Agents discovered that the house consisted of a one-bedroom residence and Ramos was the only person at home. When law enforcement arrived, Ramos grabbed his backpack, ran into the bathroom, and barricaded himself inside. Agents forcibly breached the door to arrest Ramos and recover the drugs.

Agents seized from inside Ramos's backpack multiple plastic baggies and bottles containing suspected narcotics, scales and other drug paraphernalia, and indicia of Ramos's possession. Photographs of the suspected narcotics, drug paraphernalia, and cash recovered from the residence are shown below.





FBI agents later weighed and tested the seized suspected narcotics with a TruNarc device. Ramos possessed approximately 13 ounces (382 grams) of fentanyl and approximately 8.5 ounces (240 grams) of methamphetamine, in addition to other controlled substances. Photographs of the fentanyl and methamphetamine are shown below.







Law enforcement also recovered from Ramos's bedroom an AR-15-style ghost rifle with a barrel that had been modified to shoot 7.62x39 rounds. The ghost gun did not have a serial number; instead, "AR001" had been etched by hand on the gun. Three high-capacity magazines were also found next to the gun, two of which contained 16 rounds and 17 rounds, respectively. Another 20 loose rounds also recovered. The firearm and magazines are pictured below.



### B.     Criminal History

The defendant is a Honduran national without legal immigration status in the United States. U.S. Border Patrol apprehended Ramos on or about May 13, 2018, shortly after he crossed the United States/Mexico border illegally to enter the United States. He was then transferred to an ICE Juvenile Facility. On or about May 23, 2018, the defendant ran away from the juvenile facility and he has been on the run ever since. ICE has placed over eight detainers for Ramos in San Francisco County.

Despite having only been in the country for two-and-a-half years, Ramos has sustained one felony conviction and numerous arrests for drug sales and other offenses. On October 7, 2019, the defendant was convicted for violating California Penal Code ("CPC") § 32 – Accessory after the Fact, and he received a sentence of 3 years' probation and 36 days jail, with imposition of sentence suspended. Although he was convicted on a subsequent count of accessory, he was initially charged with *ten* counts, including possession/purchase of cocaine base for sale, manufacturing/sale/possession of metal knuckles, possession/purchase for sale of narcotics/controlled substances, and contempt/disobeying a court order.

In total, the defendant has been arrested no fewer than *13 times* in San Francisco, mainly on charges related to narcotics possession with intent to distribute, contempt/disobeying a court order (CPC § 166(a)(4)), and/or obstructing a public officer (CPC § 148(a)(1)). He also has three outstanding felony warrants for his arrest in San Francisco.

## II.    Argument

### A.     Legal Standard

The Bail Reform Act permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406.

"[T]he Bail Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). The Court must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible. *Id.* Consideration of factors outside the articulated factors set forth in Section 3142 is also disfavored. *Id.*

Because defendant has been charged with an offense for which a maximum term of 20 years is prescribed in the Controlled Substances Act, 21 U.S.C. § 801 et seq., there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A).

### B.     The Section 3142(g) Factors Weigh in Favor of Detention

#### 1.     Nature and Circumstances of the Offense

The nature and circumstances of the defendant's offense are serious and reflect the severe danger that he poses to the community. Both the type and quantity of drugs that the defendant trafficked and possessed at his home distinguish him from the average low-level street-dealer in the Tenderloin. While the defendant sells several types of drugs, including cocaine and methamphetamine, the FBI investigation determined that he primarily sells fentanyl. This is not a case where an undercover "buy" officer purchased a small amount of drugs from the defendant and subsequently arrested him. Across the two controlled purchased on or about October 8, 2020 and December 7, 2020, the defendant distributed approximately half a pound of fentanyl to CW. Although the defendant has not been charged with a B-weight offense, the quantity of fentanyl that he sold in each controlled purchase (four ounces) is sufficient by itself to trigger a five-year mandatory minimum sentence of imprisonment under 18

U.S.C. § 841(a)(1) and (b)(1)(B).

Furthermore, when law enforcement arrested the defendant and searched his residence on December 10, 2020, officers seized an additional 13 ounces of fentanyl and 8.5 ounces of methamphetamine. The entirety of the drugs is attributed to the defendant because they were contained in his backpack, which he grabbed when officers arrived at his residence, and the defendant was alone in the one-bedroom home at the time of the search and arrest. This is a significant and dangerous quantity of drugs that would have quickly made its way to the Tenderloin but for the defendant's timely arrest.

The defendant's dealing of fentanyl is of particular concern because fentanyl, a Schedule II controlled substance, is a highly potent synthetic opioid. Fentanyl is about 50 times stronger than heroin and about 100 times stronger than morphine. Data compiled by the DEA shows that availability of fentanyl in the United States has drastically increased from 2013 to the present.[2] Further, according to the Centers of Disease Control and Prevention, two out of three of the 46,802 opioid overdose deaths in 2018 involved synthetic opioids such as fentanyl.[3] In San Francisco, between 2017 and 2019, the number of fentanyl overdose deaths have more than quintupled, from 36 deaths in 2017 to 89 deaths in 2018 to at least 162 deaths in 2019. In addition, the San Francisco Office of the Medical Examiner published data indicating that approximately 300 people in the city of San Francisco died between January and August 2020 due to accidental overdoses from fentanyl.[4] According to the DEA, just two milligrams of fentanyl can be a fatal dose.

In all of this, the Tenderloin neighborhood has been especially severely impacted by illegal drug dealing. "San Francisco's Tenderloin neighborhood is known to users and dealers throughout the Bay Area as a place to buy illegal drugs," according to local law enforcement.[5] Indeed, more than half of all

---

[2] Drug Enforcement Administration. 2019 National Drug Threat Assessment, December 2019, pp. 9-11, available at https://www.dea.gov/sites/default/files/2020-02/DIR-007-20%202019%20National%20Drug%20Threat%20Assessment%20-%20low%20res210.pdf (last accessed Dec. 20, 2020).

[3] Drug Overdose Deaths. Centers for Disease Control and Prevention, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html (last accessed Dec. 7, 2020).

[4] Rodda, Luke N., Report on Accidental Overdose Deaths – January to August, 2020, Office of the Chief Medical Examiner, available at https://www.sfexaminer.com/news/reportdrug-overdose-deaths-in-2020-already-surpass-2019s-staggering-high/ (last accessed Dec. 7,2020).

[5] *See* Budget and Legislative Analyst, City and County of San Francisco Board of Supervisors, Policing and Criminal Justice Costs Related to Open Air Drug Dealing in the Tenderloin, South of Market, and Mid-Market

the drug sales incidents booked or cited by the San Francisco Police Department ("SFPD") took place in the Tenderloin district—specifically, "56 percent … by far the highest of any police district in the City" in fiscal year 2017 to 2018.[6] Simply put, illegal drug sales, and the corresponding effects of drug dealing, have disproportionally impacted the Tenderloin neighborhood of San Francisco.

The danger to the community is exacerbated by Ramos's possession of an AR-15 style ghost rifle and magazines loaded with ammunition. The threat to public safety presented by drug-dealers who possess semi-automatic assault rifles cannot be overstated. The firearm seized from the defendant's home on December 10, 2020 was no ordinary handgun. First, the AR-15 style rifle was a ghost gun, which means that it was deliberately manufactured as an unfinished 80% receiver so that the owner or user can evade the background checks required when buying a firearm. Ghost guns also lack serial numbers, which makes them difficult to trace. Because they are untraceable and available to anyone, including those who could not pass a background check, ghost guns are frequently the weapon of choice for criminals. A records check on the firearm found in the defendant's home revealed no registration information. In this case, Ramos was prohibited from possessing a firearm because he is an alien who is illegally or unlawfully in the United States. *See* 18 U.S.C. § 922(g)(5)(A).

Second, the AR-15 style ghost rifle was a semi-automatic rifle that had been modified to shoot 7.62x39 cartridges, making it an assault weapon with lethal ability to inflict devastating harm when fired. The 7.6x39 round, which is an AK-47 variant, is a military-grade round and the most powerful ammunition in the world. AR-15s or similar rifles were the primary weapons used in around half of the 10 deadliest mass shootings in modern American history, including the 2012 Sandy Hook Elementary School shooting, the 2015 San Bernardino attack, the 2017 Las Vegas shooting, the 2017 Sutherland Springs church shooting, and the 2018 Stoneman Douglas High School shooting.

### 2. Weight of the Evidence

The weight of the evidence also favors detention because there is strong evidence of the defendant's guilt. The evidence against the defendant includes the narcotics he sold to CW on two

---

neighborhoods (Apr. 25, 2019), at 10, *available at* https://sfbos.org/sites/default/files/BLA_042519_Open_Drug_Dealing_Sup_Haney.pdf (last visited August 23, 2020).

[6] *Id.* at 1.

separate occasions, which tested presumptively positive for fentanyl, and the drugs seized from his residence, which tested presumptively positive for fentanyl and methamphetamine. There is also evidence that identifies the defendant as the individual who sold fentanyl to CW, including text messages between the defendant and CW that coordinate the purchase of fentanyl, FBI surveillance, and information provided by CW that has proven trustworthy and credible to date. While the weight of the evidence is deemed the least important by case law, courts are still "require[d]" to consider it, and it can help establish dangerousness. *United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008) (finding that "the weight of the evidence clearly and convincingly establishe[d]" a likelihood that the defendant would pose a danger if released). Likewise, overwhelming evidence of the defendant's guilt "makes it more likely that he will flee," particularly in light of the lengthy term of imprisonment that Ramos potentially faces here. *United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991).

### 3.    History and Characteristics of the Defendant

The defendant's criminal history and characteristics demonstrate that he is an incorrigible drug dealer who has proven time and again that he will continue dealing potent drugs, undeterred by repeated law enforcement contacts.

The defendant has a long track record of selling dangerous drugs, primarily fentanyl, in a particularly vulnerable community. Fentanyl is among the top causes of the increasing number of overdose deaths afflicting the Tenderloin and San Francisco at large, as set forth in the statistics above. At the time of his arrest, the defendant apparently was living somewhere in Oakland, California and therefore was commuting into San Francisco for the specific purpose of selling narcotics in and around the Tenderloin neighborhood, taking advantage of the most vulnerable members of the San Francisco community for profit.

The defendant may attempt to soften the seriousness of his conduct by framing the weight of the drugs that he sold to CW and the drugs seized from the defendant's home as trivial, or by claiming that his two drug sales were isolated instances of low-level drug dealing. But the defendant's extensive history of drug dealing in San Francisco and the Tenderloin tells a different story. Unlike some other drug dealers who appear before this Court, this is not the defendant's first drug-related arrest, and the defendant, although a young man, has shown that his decision to deal drugs was not some one-off

youthful indiscretion; it is part of a pattern of repeated illegal and dangerous conduct that destroys individuals, families, and communities. *See United States v. Lopez*, 104 F.3d 1149, 1151 (9th Cir. 1997) (noting that "[n]arcotics trafficking enables traffickers to reap illicit financial gains and inflict the detrimental effects of narcotics use upon our society"). Within five months of arriving in the United States, the defendant decided to sell drugs and engage in criminal activity, rather than lead a law-abiding life.

Although the defendant has only one prior felony conviction from October 2019 for CPC § 32 – Accessory after the Fact, his minimal conviction record fails to capture the full extent of his drug-trafficking and other criminal activities. Since October 2018 he has been arrested at least 13 times in San Francisco, most frequently for drug-related offenses, contempt/disobeying a court order, and/or obstructing or resisting a police officer. In all but one case, he was arrested on one or more California felony drug sales charges, specifically Health and Safety Code ("HSC"), Section 11378 – Possession of Controlled Substance for Sale, Section 11351 – Possession/Purchase for Sale of Narcotics/Controlled Substances, and/or Section 11351.5 – Possession/Purchase of Cocaine Base for Sale. These prior arrests for drug sales failed to deter the defendant from further drug dealing. According to SFPD records, Ramos was arrested three times in San Francisco over the past year and three months on charges related to narcotics possession with intent to distribute. During two of these arrests, Ramos resisted and/or obstructed police officers, and on one occasion he was arrested for battery against a police officer. Each time, the defendant was also arrested for contempt/disobeying a court order. Most recently, SFPD arrested the defendant on July 17, 2020 on three felony counts related to transportation/sale/possession of narcotics controlled substances. Based on his pattern of behavior, it is highly likely that Ramos will continue to sell drugs if he is released pending trial.

### 4. The Defendant is a Danger to the Community

As described above, there is strong evidence that the defendant poses a serious danger to the community based on the large quantity of fentanyl he sold to CW and the even larger amount of fentanyl and methamphetamine seized from his home in connection with the instant offense; his illegal possession of an AK-47 variant semi-automatic ghost rifle and ammunition; and a continuous string of arrests for felony drug sales and other charges. Furthermore, no combination of release conditions can

reasonably assure the safety of the public. Ramos has a track record of disobeying court orders and forcibly resisting police offers who attempt to arrest him. He has been arrested no fewer than ten times for contempt/disobeying a court order in violation of CPC § 166(a)(4); at least three times for resisting or obstructing a police officer in violation of CPC § 148(a)(1); and at least once for resisting a police officer by use of force or violence in violation of CPC § 69(a).

Two arrests stand out as particularly alarming and demonstrate the severity of the threat that the defendant poses not only to the safety of the community, but also to law enforcement officers who put their lives and safety on the line to protect the community. On September 2, 2019, the defendant was arrested on multiple charges, including CPC § 21810 – Manufacture/Sale/Possession of Metal Knuckles, CPC § 243(c)(2) – Battery Against a Peace Officer who is engaged in the performance of duties, and various drug possession or purchase for sale charges. The defendant was ultimately convicted on one felony count of being an accessory in violation of CPC § 32. The very next day after this arrest, on September 3, 2019, SFPD arrested the defendant again on almost identical charges, including battery against a police officer and manufacture/sale/possession of metal knuckles. As the defendant has repeatedly demonstrated through his use of force against police officers during arrests for serious drug offenses and possession of weapons, the risk to public safety and to law enforcement are too severe to warrant his release. The potential threat to Pretrial Services officers is also serious if he is placed under their supervision. The defendant's numerous arrests for contempt and disobeying court orders also proves that he cannot and will not conform his behavior to court-imposed conditions of supervised release.

      **C.**      **The Defendant is a Flight Risk**

No conditions of supervised release would assure the defendant's appearance for court hearings. First, the defendant has every incentive to flee because if he is convicted he would face deportation to Honduras after serving any custodial sentence in the United States. The defendant fled from an ICE Juvenile Facility on or about May 23, 2018, and he has been on the run ever since. He has more than eight ICE detainers in San Francisco County, none of which have been honored to date.

Second, the defendant has no known employment, no assets, and no significant ties to the community to mitigate his flight risk. His mother, father, and two siblings all live in Honduras. He is

13

unmarried, although he has been in a relationship with Tamela Gomez for one year, and he has no children. The defendant himself has only lived in the United States for two years. Based on information provided by PG&E and the United States Postal Inspection Service ("USPIS"), there is no direct connection between the defendant and the Oakland address at which he resided prior to arrest. Criminal records also reflect that the defendant has used six aliases and one alternate date of birth in the past.

Third, the defendant's risk of flight is not merely hypothetical. On or about October 26, 2020, FBI agents followed the defendant as he drove towards San Rafael, California. Shortly after entering the Richmond-San Rafael Bridge, the defendant crashed his car into a stalled vehicle on the Bridge. The defendant then reversed and crashed into a second vehicle as the defendant tried to flee the accident scene. The defendant continued to drive westbound on Interstate-580 and exited onto Andersen Drive in San Rafael, where he was stopped by the driver of the second vehicle he had impacted. Within minutes of stopping on Andersen Drive, the defendant retrieved a backpack from his car and fled the scene on foot, abandoning his vehicle. California Highway Patrol ("CHP") officers searched the abandoned vehicle and found narcotics paraphernalia and indicia in the front seat. FBI agents and CHP officers were unable to find and arrest the defendant.

The defendant has also proven that he will continue to commit crimes while on release. For example, on December 24, 2018, Ramos was arrested for possession of a controlled substance for sale, subject to an enhancing factor because he was on bail at the time of his arrest. The risk that the defendant will continue to traffic in fentanyl and other dangerous drugs in the Tenderloin and commit other crimes are too great to warrant his release.

Finally, the government concurs with Pretrial Services's finding in its Pre-Bail Report that Tamela Gomez is not a viable surety due to her uncertain immigration status.

### D. The Risk that Ramos May Contract COVID-19 at Santa Rita Jail Does Not Warrant Pretrial Release

While the current pandemic presents an unprecedented and tragic situation that is afflicting everyone, COVID-19 does not change the Bail Reform Act's mandate of an "individualized evaluation guided by the factors articulated in § 3142(g)" for determining whether a defendant should be granted bail. *Diaz-Hernandez*, 943 F.3d at 1199. Nor does it alter the pretrial detention standard whereby the

Court must detain the defendant if it finds that the defendant is either a danger to the community or a flight risk.

As other judges of this Court have found, the COVID-19 pandemic does not meaningfully shift the balance of the § 3142(g) factors in defendant's favor. *See, e.g.*, *United States v. Trujillo*, No. 20-cr-00028-EJD-1 (SVK), Dkt. 15 (N.D. Cal. March 19, 2020) (rejecting a motion for release premised on the emergence of COVID-19 because the existence and spread of COVID-19 did nothing to undermine the Court's previous findings regarding risk of flight and danger to the community); *see also United Sates v. Cazares*, No. 18-cr-00466-BLF-1, Dkt. 351 (N.D. Cal. Apr. 23, 2020) (concluding, in the pre-trial detention context, that "the balancing of the factors does not warrant [defendant's] release [because he] continues to pose a serious risk to the safety of the community, and that risk overrides [defendant's] concerns that he might contract COVID-19 at [local jail]."); *United States v. Phillips*, No. 20-cr-00099-JST-1, Dkt. 29 (N.D. Cal. Apr. 13, 2020) (rejecting motion for release under § 3142(i) and inability to prepare defense due to COVID-19 because the existence and spread of COVID-19 did nothing to undermine the Court's previous findings that defendant presents a danger to the community).

Consideration of the Section 3142(g) – which are unaffected by COVID-19 – compels this Court to conclude that Ramos remains a danger to the community and a flight risk and must therefore be detained pending trial. Nothing about the COVID-19 pandemic reduces the danger that the defendant will commit another assault with a firearm, continue carrying firearms as a felon, or commit other crimes that violate the conditions of his supervised release.

Moreover, at this time, the Government is not aware of any facts (i.e., age or medical conditions) that would put the defendant at greater risk of developing serious illness due to COVID-19 were he to contract it. The defendant is a healthy 22-year-old man with no known physical or mental health issues.

\\
\\
\\
\\
\\
\\

### IV. Conclusion

Compliance with conditions, particularly the current shelter-in-place orders, is imperative during the public health emergency. Because there are no conditions that can reasonably assure the safety of the community or adequately mitigate his flight risk, Gustabo Ramos should be detained pending trial.

DATED: December 21, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

/s/
YOOSUN KOH
Assistant United States Attorney