1    DAVID L. ANDERSON (CABN 149604)
     United States Attorney
2
     HALLIE HOFFMAN (CABN 210020)
3    Chief, Criminal Division

4    YOOSUN KOH (NYBN 5245220)
     Assistant United States Attorney
5
          450 Golden Gate Avenue, Box 36055
6         San Francisco, California 94102-3495
          Telephone: (415) 436-7034
7         FAX: (415) 436-7234
          Yoosun.Koh@usdoj.gov
8
     Attorneys for United States of America
9
                    UNITED STATES DISTRICT COURT
10
                 NORTHERN DISTRICT OF CALIFORNIA
11
                     SAN FRANCISCO DIVISION
12

13   UNITED STATES OF AMERICA,              )   NO. 3:20-MJ-71799 MAG
                                            )
14           Plaintiff,                     )   UNITED STATES' MOTION TO
                                            )   (1) REVOKE RELEASE ORDER AND ORDER
15       v.                                 )       DEFENDANT DETAINED
                                            )   (2) TEMPORARILY STAY MAGISTRATE
16   GUSTABO RAMOS,                         )       JUDGE'S ORDER GRANTING RELEASE
                                            )
17           Defendant.                     )   Judge: Hon. Edward J. Davila
                                            )   Date:  December 24, 2020
18                                          )   Time: 3:00 p.m.
                                            )
19   _____

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

**MOTION TO REVOKE RELEASE ORDER AND ORDER DEFENDANT DETAINED** .................................................................................................1

**STATEMENT OF FACTS** ...........................................................................................2

**I.     PROCEDURAL HISTORY** ..............................................................................2

**II.    CHARGE AND OFFENSE CONDUCT** ..........................................................3

     A.    Defendant Sold Eight Ounces of Fentanyl to a CW .........................................3

     B.    Law Enforcement Seized Fentanyl, Methamphetamine, and an AR-15-style Ghost Rifle from Defendant's Home ...................................................................5

     C.    Criminal History .............................................................................................8

**ARGUMENT** ...............................................................................................................8

**I.     DEFENDANT SHOULD BE DETAILED PRETRIAL UNDER THE BAIL REFORM ACT** ...........................................................................................8

     A.    Legal Standard .................................................................................................8

     B.    The Section 3142(g) Factors Weigh in Favor of Detention.............................10

     C.    The Magistrate Judge's Reasons For Releasing the Defendant Are Not Supported by the Record.................................................................................15

     D.    The Risk that the Defendant May Contract COVID-19 at Santa Rita Jail Does Not Warrant Pretrial Release ........................................................................18

**CONCLUSION** ..........................................................................................................19

# Table of Authorities

Page(s)

**Other Authorities**

*United States v. Diaz-Hernandez*,
943 F.3d 1196 (9th Cir. 2019) ................................................................ 9, 18

*United States v. Gebro*,
948 F.2d 1118 (9th Cir. 1991) ..................................................................... 12

*United States v. Hir*,
517 F.3d 1081 (9th Cir. 2008) ..................................................................... 12

*United States v. Koenig*,
912 F.2d 1190 (9th Cir. 1990) .................................................................. 8, 9

*United States v. Lopez*,
104 F.3d 1149 (9th Cir. 1997) ..................................................................... 13

*United States v. Motamedi*,
767 F.2d 1403 (9th Cir. 1985) ...................................................................... 9

*United States v. Winsor*,
785 F.2d 755 (9th Cir. 1986) ........................................................................ 9

**Statutes**

18 U.S.C. § 841(a)(1)....................................................................................... 9

18 U.S.C. § 922(g)(5)(A) ............................................................................... 11

18 U.S.C. § 3142(e)(1).................................................................................... 8

18 U.S.C. § 3142(e)(3)(A) .............................................................................. 9

18 U.S.C. § 3142(f)(2)(B) ............................................................................... 8

18 U.S.C. § 3145(a)(1)..................................................................................... 8

21 U.S.C. § 801 ............................................................................................... 9

21 U.S.C. § 841(a)(1)................................................................................... 2, 4

18 U.S.C. § 3142(g) ..................................................................................... 8, 9

**MOTION TO REVOKE RELEASE ORDER AND ORDER DEFENDANT DETAINED**

On December 10, 2020, Gustabo Ramos was arrested at his home with approximately 380 grams of fentanyl, 240 grams of methamphetamine, and an AR-15 style ghost rifle that had been modified into a 7.62 semi-automatic assault weapon with two loaded magazines.  On the previous day, the United States Attorney's Office had filed a criminal complaint charging Ramos with distribution of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C).

As described further below,[1] the defendant is a dangerous drug-trafficker who is known to sell fentanyl, cocaine, and methamphetamine in quantities as large as pounds and kilograms in the Tenderloin neighborhood of San Francisco.  In addition to the drugs that FBI agents seized from Ramos's home, the defendant is responsible for at least another half-pound of fentanyl based on two sales to a Cooperating Witness ("CW").  These are significant quantities of fentanyl that make the defendant more dangerous than most of the street-level drug-dealers in the Tenderloin.  Furthermore, the defendant is not your average low-level dealer who has been brought in on his first drug-related arrest. The defendant's criminal history reveals that he has been arrested no fewer than *13 times* on charges related to drug trafficking, disobeying court orders, and resisting/obstructing a public officer, since he entered the country illegally in May 2018.

The defendant's prolific drug trafficking activities, his illegal possession of a semi-automatic firearm, and his record of disobeying court orders and obstructing/resisting law enforcement officers demonstrate that no condition or combination of conditions can reasonably assure the safety of the community or the defendant's future appearance in court.  Therefore, the magistrate judge should not have ordered the defendant released and the government moves the Court to detain the defendant pending trial.

---

[1] This Motion to Revoke the Release Order and Order Defendant Detained amends and corrects the previous Motion filed on December 22, 2020 (ECF 12).  The amended version contains corrections to paragraph 2 on page 5 regarding FBI agents' entry into the defendant's residence and observations of the defendant prior to arrest.  There are also minor revisions of references to exhibits.

**STATEMENT OF FACTS**

**I.      PROCEDURAL HISTORY**

On December 9, 2020, defendant Gustabo Ramos was charged by complaint with one count of distribution of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).  On the same day, the Honorable Jacqueline S. Corley, U.S. Magistrate Judge for the Northern District of California, issued an arrest warrant authorizing the arrest of, Ramos, along with a warrant to search his residence, person, and vehicle for drugs and other evidence, fruits, and/or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846.  FBI agents executed the warrants on December 10, 2020 at Ramos's residence in Oakland, California and arrested Ramos. Defendant had his initial appearance on December 11, 2020, at which the government moved for detention.  On December 16, 2020, defense counsel, Alanna Coopersmith, was appointed to represent Ramos and the defendant was arraigned on the complaint.

On December 21, 2020, Pretrial Services produced a pre-bail report recommending that the defendant be detained because it believes the defendant poses a significant risk of non-appearance that cannot be reasonably mitigated by a combination of release conditions.  The report identified as aggravating factors the defendant's substance abuse history; lack of verifiable, legitimate employment; the nature of the offense charged; the defendant's active warrants out of San Francisco County; his family ties to Honduras; and his criminal activity while under supervision.  It also found that the defendant's proposed surety and custodian, his 22-year-old girlfriend of one year, Tamela Gomez, is not a viable bail co-signor due to her immigration status.  Pretrial Services noted that it was not aware of any significant mitigating factors.

However, on December 22, 2020, the Hon. Magistrate Judge Laurel Beeler ordered the defendant released on an unsecured bond, signed by his girlfriend Ms. Gomez as a surety, and also requiring her to act as his custodian.[2]  The government objected and requested a stay of the release order until 12:00 p.m. on December 23, 2020, which it received to file the instant appeal.

---

[2] On December 21, 2020, the defendant filed a motion to dismiss for lack of subject matter jurisdiction on the grounds that he is a minor.  At the detention hearing on December 22, 2020, Magistrate Judge Beeler found, and defense counsel agreed, that the issue is not ripe for disposition.

## II.     CHARGE AND OFFENSE CONDUCT

### A.     Defendant Sold Eight Ounces of Fentanyl to a CW

As further described in Federal Bureau of Investigation ("FBI") Special Agent David Peacock's affidavit in support of the criminal complaint and in the Declaration of FBI Special Agent Jon Clemens ("Clemens Decl."), FBI used a CW, whose information has been found to be trustworthy, credible, and corroborated by independent investigation, to conduct two controlled purchases of fentanyl in the Tenderloin.  *See* Declaration of Yoosun Koh ("Koh Decl.") ¶ 2, Ex. A (Clemens Decl.) ¶¶ 12, 16.  The CW told agents that he/she had purchased fentanyl from an individual whom he/she referred to as "William" Last Name Unknown in the past.  The individual referred to as "William" was later determined to be Gustabo Ramos.[3]  The CW also said that Ramos could be found dealing drugs nearly every night in the Tenderloin and that Ramos sold fentanyl, cocaine, and methamphetamine in quantities as large as kilograms.  CW stated that he/she contacted Ramos via text when CW wanted to meet in the Tenderloin to purchase fentanyl.

On October 7, 2020, at the direction of federal agents, CW sent a text message to Ramos to coordinate the purchase of fentanyl on the evening of October 8, 2020.  The following day, FBI agents used CW to execute a controlled purchase of fentanyl from Ramos in the Tenderloin.  *See* Koh Decl. ¶ 3, Ex. B (FBI FD-302 dated October 21, 2020).  Agents conducted physical surveillance near the street corner where CW and Ramos had agreed to make the drug transaction.  They observed a dark-colored Nissan sedan arrive in the vicinity, and then saw CW getting into the vehicle.  CW confirmed later that the driver of the Nissan sedan was Ramos and that he/she purchased four ounces of fentanyl from Ramos in exchange for $4,000.  CW relinquished to agents approximately four ounces (114.3 grams) of a white powdery substance.  The suspected narcotics tested presumptively positive for fentanyl using a TruNarc instrument.  A photograph of the seized fentanyl is shown below.  This first controlled purchase on or about October 8, 2020 forms the basis of the complaint.

---

[3] On November 10, 2020, federal agents shared surveillance photos of William with officers of the San Francisco Police Department ("SFPD"), Tenderloin Station.  SFPD officers positively identified William as Gustabo Alfonso Ramos, the individual charged in the complaint.  To avoid confusion, the remainder of this memorandum refers to William as Gustabo Ramos.



On the evening of December 6, 2020, CW positively identified Ramos in the Tenderloin neighborhood.  During their in-person meeting, Ramos provided CW with his new telephone number.  Later that evening, CW initiated a text conversation with Ramos to coordinate the purchase of narcotics on December 7, 2020.  On or about the evening of December 7, 2020, Ramos met with CW in the Tenderloin and sold to CW approximately 3.4 ounces (94 grams) of fentanyl in exchange for $3,000.  *See* Koh Decl. ¶ 2, Ex. A (Clemens Decl.) ¶ 16.  CW relinquished to FBI agents, who conducted physical surveillance during the transaction, two plastic bags containing the suspected fentanyl.  A TruNarc test revealed that the substances tested presumptively positive for fentanyl.  A photograph of the seized fentanyl is shown below.



Across the two controlled purchased on or about October 8, 2020 and December 7, 2020, Ramos distributed approximately half a pound of fentanyl.

### B.   Law Enforcement Seized Fentanyl, Methamphetamine, and an AR-15-style Ghost Rifle from Defendant's Home

On December 9, 2020, the Honorable Jacqueline S. Corley, U.S. Magistrate Judge for the Northern District of California, issued a complaint against, and arrest warrant authorizing the arrest of, Ramos, along with a warrant to search his residence, person, and vehicle for drugs and other evidence, fruits, and/or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846.  FBI agents executed the warrants on December 10, 2020 at Ramos's residence in Oakland, California.  *See* Koh Decl. ¶ 2, Ex. A (Clemens Decl.) ¶¶ 17-19; Koh Decl. ¶ 4, Ex. C (FBI FD-302, dated December 22, 2020).  Agents knocked and announced their presence at the front door, but the defendant refused to answer or come to the door.  Agents then breached the front security gate and front door to enter the house.  They performed a protective sweep of the residence, while continuing to announce their presence.  Agents found a locked door in the house, which they could not open, and determined that the defendant had barricaded himself behind it.  They then breached the locked door and found the defendant in the bathroom with a backpack.  Ramos was placed under arrest.  *See* Koh Decl. ¶ 2, Ex. A (Clemens Decl.) ¶ 17; Koh Decl. ¶ 5, Ex. D (FBI FD-302, dated December 17, 2020).

Agents seized from inside Ramos's backpack multiple plastic baggies and bottles containing suspected narcotics, scales and other drug paraphernalia, and indicia of Ramos's possession. Photographs of the suspected narcotics, drug paraphernalia, and cash recovered from the residence are shown below.





FBI agents later weighed and tested the seized suspected narcotics with a TruNarc device. Ramos possessed approximately 13 ounces (382 grams) of fentanyl and approximately 8.5 ounces (240 grams) of methamphetamine, in addition to other controlled substances. *See* Koh Decl. ¶ 2, Ex. A (Clemens Decl.) ¶¶ 19; Koh Decl. ¶ 4, Ex. C (FBI FD-302, dated December 22, 2020).  Photographs of the fentanyl and methamphetamine are shown below.









Law enforcement also recovered from Ramos's bedroom an AR-15-style ghost rifle with a barrel that had been modified to shoot 7.62x39 rounds.  The ghost gun did not have a serial number; instead, "AR001" had been etched by hand on the gun.  Three high-capacity magazines were also found next to the gun, two of which contained 16 rounds and 17 rounds, respectively.  Another 20 loose rounds were also recovered.  *See* Koh Decl. ¶ 2, Ex. A (Clemens Decl.) ¶ 18; Koh Decl. ¶ 4, Ex. C (FBI FD-302, dated December 22, 2020).  The firearm and magazines are pictured below.



### C.      Criminal History

The defendant is a Honduran national without legal immigration status in the United States.  U.S. Border Patrol apprehended Ramos on or about May 13, 2018, shortly after he crossed the United States/Mexico border illegally to enter the United States.  He was then transferred to an ICE Juvenile Facility.  On or about May 23, 2018, the defendant ran away from the juvenile facility and he has been on the run ever since.

Despite having only been in the country for two-and-a-half years, Ramos has sustained one felony conviction and numerous arrests for drug sales and other offenses.  On October 7, 2019, the defendant was convicted for violating California Penal Code ("CPC") § 32 – Accessory after the Fact, and he received a sentence of 3 years' probation and 36 days jail, with imposition of sentence suspended.  Although he was convicted on a subsequent count of accessory, he was initially charged with *ten* counts, including possession/purchase of cocaine base for sale, manufacturing/sale/possession of metal knuckles, possession/purchase for sale of narcotics/controlled substances, and contempt/disobeying a court order.

In total, the defendant has been arrested no fewer than *13 times* in San Francisco, mainly on charges related to narcotics possession with intent to distribute, contempt/disobeying a court order (CPC § 166(a)(4)), and/or obstructing a public officer (CPC § 148(a)(1)).  He also has three outstanding felony warrants for his arrest in San Francisco.

## ARGUMENT

## I.      DEFENDANT SHOULD BE DETAILED PRETRIAL UNDER THE BAIL REFORM ACT

### A.      Legal Standard

On a bail appeal, the Court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference."  *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990); *see also* 18 U.S.C. § 3145(a)(1).  The record is not limited to those facts that were presented to the magistrate judge.  Rather, this Court should "make its own 'de novo' determination of the facts," and the "ultimate determination of the propriety of

detention is to be decided without deference to the magistrate's ultimate conclusion." *Koenig*, 912 F.2d at 1193.

The Bail Reform Act permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406.

"[T]he Bail Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). The Court must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible. *Id.* Consideration of factors outside the articulated factors set forth in Section 3142 is also disfavored. *Id.*

Because defendant has been charged with an offense for which a maximum term of 20 years is prescribed in the Controlled Substances Act, 21 U.S.C. § 801 et seq., there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A).

1

2

**B.      The Section 3142(g) Factors Weigh in Favor of Detention**

    **1.      Nature and Circumstances of the Offense**

3    The nature and circumstances of the defendant's offense are serious and reflect the severe danger

4    that he poses to the community.  Both the type and quantity of drugs that the defendant trafficked and

5    possessed at his home distinguish him from the average low-level street-dealer in the Tenderloin.  While

6    the defendant sells several types of drugs, including cocaine and methamphetamine, the FBI

7    investigation determined that he primarily sells fentanyl.  This is not a case where an undercover "buy"

8    officer purchased a small amount of drugs from the defendant and subsequently arrested him.  Across

9    the two controlled purchased on or about October 8, 2020 and December 7, 2020, the defendant

10    distributed approximately half a pound of fentanyl to CW.  Although the defendant has not been charged

11    with a B-weight offense, the quantity of fentanyl that he sold in each controlled purchase (four ounces)

12    is sufficient by itself to trigger a five-year mandatory minimum sentence of imprisonment under 18

13    U.S.C. § 841(a)(1) and (b)(1)(B).

14    Furthermore, when law enforcement arrested the defendant and searched his residence on

15    December 10, 2020, officers seized an additional 13 ounces of fentanyl and 8.5 ounces of

16    methamphetamine.  The entirety of the drugs is attributed to the defendant because they were contained

17    in his backpack, which he grabbed when officers arrived at his residence, and the defendant was alone in

18    the one-bedroom home at the time of the search and arrest.  This is a significant and dangerous quantity

19    of drugs that would have quickly made its way to the Tenderloin but for the defendant's timely arrest.

20    The defendant's dealing of fentanyl is of particular concern because fentanyl, a Schedule II

21    controlled substance, is a highly potent synthetic opioid.  Fentanyl is about 50 times stronger than heroin

22    and about 100 times stronger than morphine.  Data compiled by the DEA shows that availability of

23    fentanyl in the United States has drastically increased from 2013 to the present.[4]  Further, according to

24    the Centers of Disease Control and Prevention, two out of three of the 46,802 opioid overdose deaths in

25

26

27

28

---

[4] Drug Enforcement Administration. 2019 National Drug Threat Assessment, December 2019, pp. 9-11, available at https://www.dea.gov/sites/default/files/2020-02/DIR-007-20%202019%20National%20Drug%20Threat%20Assessment%20-%20low%20res210.pdf (last accessed Dec. 20, 2020).

2018 involved synthetic opioids such as fentanyl.[5]  In San Francisco, between 2017 and 2019, the number of fentanyl overdose deaths have more than quintupled, from 36 deaths in 2017 to 89 deaths in 2018 to at least 162 deaths in 2019.  In addition, the San Francisco Office of the Medical Examiner published data indicating that approximately 300 people in the city of San Francisco died between January and August 2020 due to accidental overdoses from fentanyl.[6]  Indeed, overdose deaths, primarily attributable to fentanyl, have outpaced COVID-19 deaths in San Francisco in 2020.[7]  According to the DEA, just two milligrams of fentanyl can be a fatal dose.

In all of this, the Tenderloin neighborhood has been especially severely impacted by illegal drug dealing.  "San Francisco's Tenderloin neighborhood is known to users and dealers throughout the Bay Area as a place to buy illegal drugs," according to local law enforcement.[8]  Indeed, more than half of all the drug sales incidents booked or cited by the San Francisco Police Department ("SFPD") took place in the Tenderloin district—specifically, "56 percent … by far the highest of any police district in the City" in fiscal year 2017 to 2018.[9]  Simply put, illegal drug sales, and the corresponding effects of drug dealing, have disproportionally impacted the Tenderloin neighborhood of San Francisco.

The danger to the community is exacerbated by Ramos's possession of an AR-15 style ghost rifle and magazines loaded with ammunition.  The threat to public safety presented by drug-dealers who possess semi-automatic assault rifles cannot be overstated.  The firearm seized from the defendant's home on December 10, 2020 was no ordinary handgun.  First, the AR-15 style rifle was a ghost gun, which means that it was created from an unfinished 80% receiver.  Ghost guns are popular among

---

[5] Drug Overdose Deaths. Centers for Disease Control and Prevention, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html (last accessed Dec. 7, 2020).

[6] Rodda, Luke N., Report on Accidental Overdose Deaths – January to August, 2020, Office of the Chief Medical Examiner, available at https://www.sfexaminer.com/news/reportdrug-overdose-deaths-in-2020-already-surpass-2019s-staggering-high/ (last accessed Dec. 7,2020).

[7] https://www.mercurynews.com/2020/12/21/overdose-deaths-far-outpace-covid-19-deaths-in-san-francisco (last accessed Dec. 22, 2020).

[8] *See* Budget and Legislative Analyst, City and County of San Francisco Board of Supervisors, Policing and Criminal Justice Costs Related to Open Air Drug Dealing in the Tenderloin, South of Market, and Mid-Market neighborhoods (Apr. 25, 2019), at 10, *available at* https://sfbos.org/sites/default/files/BLA_042519_Open_Drug_Dealing_Sup_Haney.pdf (last visited August 23, 2020).

[9] *Id.* at 1.

1    criminals because they can be purchased without a background check and are more difficult to trace

2    because they lack serial numbers. A records check on the firearm found in the defendant's home

3    revealed no registration information.  In this case, Ramos was prohibited from possessing a firearm

4    because he is an alien who is illegally or unlawfully in the United States.  *See* 18 U.S.C. § 922(g)(5)(A).

5    Second, the AR-15 style ghost rifle was a semi-automatic rifle that had been modified to shoot

6    7.62x39 cartridges, making it an assault weapon with lethal ability to inflict devastating harm when

7    fired.  The 7.6x39 round, which is an AK-47 variant, is a military-grade round and the most powerful

8    ammunition in the world.  AR-15s or similar rifles were the primary weapons used in around half of the

9    10 deadliest mass shootings in modern American history, including the 2012 Sandy Hook Elementary

10   School shooting, the 2015 San Bernardino attack, the 2017 Las Vegas shooting, the 2017 Sutherland

11   Springs church shooting, and the 2018 Stoneman Douglas High School shooting.

12                    **2.      Weight of the Evidence**

13   The weight of the evidence also favors detention because there is strong evidence of the

14   defendant's guilt.  The evidence against the defendant includes the narcotics he sold to CW on two

15   separate occasions, which tested presumptively positive for fentanyl, and the drugs seized from his

16   residence, which tested presumptively positive for fentanyl and methamphetamine.  There is also

17   evidence that identifies the defendant as the individual who sold fentanyl to CW, including text

18   messages between the defendant and CW that coordinate the purchase of fentanyl, FBI surveillance, and

19   information provided by CW that has proven trustworthy and credible to date.  While the weight of the

20   evidence is deemed the least important by case law, courts are still "require[d]" to consider it, and it can

21   help establish dangerousness.  *United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008) (finding that

22   "the weight of the evidence clearly and convincingly establishe[d]" a likelihood that the defendant

23   would pose a danger if released).  Likewise, overwhelming evidence of the defendant's guilt "makes it

24   more likely that he will flee," particularly in light of the lengthy term of imprisonment that Ramos

25   potentially faces here.  *United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991).

26                    **3.      History and Characteristics of the Defendant**

27   Based on all available law enforcement records at the time of this filing, including defendant's

28   CLET report and information provided by the Department of Homeland Security, Immigration and

12

Customs Enforcement ("ICE"), the defendant is an adult over the age of 18.  The original encounter report authored by the Border Patrol agent who arrested the defendant states that the defendant's name is Carlos Cuevas-Ramos and his date of birth is September XX, 2001.  This would mean that the defendant was 16 years old when he entered the United States in May 2018.  A CLET report for Gustabo Ramos lists six aliases for the defendant, including the name Carlos Cuevas Ramos, and provides two different dates of birth, September XX, 2001 and November XX, 1998.  If defendant was born on September XX, 2001, he is currently 19-years-old.  If he was born on November XX, 1998, he is 22-years-old.

The defendant's criminal history and characteristics demonstrate that he is an incorrigible drug dealer who has proven time and again that he will continue dealing potent drugs, undeterred by repeated law enforcement contacts.  The defendant has a long track record of selling dangerous drugs, primarily fentanyl, in a particularly vulnerable community.  Fentanyl is among the top causes of the increasing number of overdose deaths afflicting the Tenderloin and San Francisco at large, as set forth in the statistics above.  At the time of his arrest, the defendant apparently was living somewhere in Oakland, California and therefore was commuting into San Francisco for the specific purpose of selling narcotics in and around the Tenderloin neighborhood, taking advantage of the most vulnerable members of the San Francisco community for profit.

The defendant may attempt to soften the seriousness of his conduct by framing the weight of the drugs that he sold to CW and the drugs seized from the defendant's home as trivial, or by claiming that his two drug sales were isolated instances of low-level drug dealing.  But the defendant's extensive history of drug dealing in San Francisco and the Tenderloin tells a different story.  Unlike some other drug dealers who appear before this Court, this is not the defendant's first drug-related arrest, and the defendant, although a young man, has shown that his decision to deal drugs was not some one-off youthful indiscretion; it is part of a pattern of repeated illegal and dangerous conduct that destroys individuals, families, and communities.  *See United States v. Lopez*, 104 F.3d 1149, 1151 (9th Cir. 1997) (noting that "[n]arcotics trafficking enables traffickers to reap illicit financial gains and inflict the detrimental effects of narcotics use upon our society").  Within five months of arriving in the United States, the defendant decided to sell drugs and engage in criminal activity, rather than lead a law-abiding life.

1    Although the defendant has only one prior felony conviction from October 2019 for CPC § 32 –

2    Accessory after the Fact, his minimal conviction record fails to capture the full extent of his drug-

3    trafficking and other criminal activities.  Since arriving in the United States in May 2018, the defendant

4    has amassed over 13 arrests in San Francisco, most frequently for drug-related offenses,

5    contempt/disobeying a court order, and/or obstructing or resisting a police officer.  His first arrest was in

6    October 2018, which indicates that he started trafficking drugs almost immediately.  In all but one case,

7    he was arrested on one or more California felony drug sales charges, specifically Health and Safety

8    Code ("HSC"), Section 11378 – Possession of Controlled Substance for Sale, Section 11351 –

9    Possession/Purchase for Sale of Narcotics/Controlled Substances, and/or Section 11351.5 –

10   Possession/Purchase of Cocaine Base for Sale.

11   These prior arrests for drug sales failed to deter the defendant from further drug dealing.

12   According to SFPD records, Ramos was arrested three times in San Francisco over the past year and

13   three months on charges related to narcotics possession with intent to distribute.   During two of these

14   arrests, Ramos resisted and/or obstructed police officers, and on one occasion he was arrested for battery

15   against a police officer.  Each time, the defendant was also arrested for contempt/disobeying a court

16   order.  The defendant currently has three active warrants for his arrest; one warrant was issued on July

17   31, 2020 for an accessory charge and two additional warrants were issued on August 14, 2020 for drug-

18   related charges.

19   Most recently, SFPD arrested the defendant on July 16, 2020 on three felony counts related to

20   transportation/sale/possession of narcotics controlled substances.  *See* Koh Decl. ¶ 6, Ex. E (SFPD

21   Incident Report No. 200426456).  SFPD performed a buy-bust operation during which Ramos sold

22   narcotics to an undercover officer.  When arresting officers approached Ramos, he ran away and ignored

23   order to stop.  Officers were ultimately able to handcuff him and seized multiple baggies of suspected

24   narcotics from his backpack.  The drugs tested presumptively positive for fentanyl, methamphetamine,

25   and heroin using a TruNarc device. Based on his pattern of behavior, it is highly likely that Ramos will

26   return to the Tenderloin and continue to sell dangerous drugs if he is released pending trial.

27

28

### C.     The Magistrate Judge's Reasons For Releasing the Defendant Are Not Supported by the Record

In granting pretrial release, the magistrate judge rejected the recommendation of Pretrial Services that Ramos be detained.  The Court appeared to do so based on two factors, neither of which are supported by the record.  First, although the magistrate judge acknowledged the danger to the community, she nevertheless ordered him released.  Second, the judge disagreed with Pretrial Services' recommendation that the defendant's girlfriend, Tamela Gomez, was an unsuitable surety because of her unverified immigration status.   For the reasons set forth below, the government urges the Court to revoke the release order and order the defendant detained because he is both a danger to the community and a flight risk, and no conditions of supervised release can adequately mitigate these risks.

### 1.     The Defendant is a Danger to the Community

As described above, there is strong evidence that the defendant poses a serious danger to the community based on the large quantity of fentanyl he sold to CW and the even larger amount of fentanyl and methamphetamine seized from his home in connection with the instant offense; his illegal possession of an AK-47 variant semi-automatic ghost rifle and ammunition; and a continuous string of arrests for felony drug sales and other charges.  Furthermore, no combination of release conditions can reasonably assure the safety of the public.  Ramos has a track record of disobeying court orders and forcibly resisting police offers who attempt to arrest him.  He has been arrested no fewer than ten times for contempt/disobeying a court order in violation of CPC § 166(a)(4); at least three times for resisting or obstructing a police officer in violation of CPC § 148(a)(1); and at least once for resisting a police officer by use of force or violence in violation of CPC § 69(a).

Two arrests stand out as particularly alarming and demonstrate the severity of the threat that the defendant poses not only to the safety of the community, but also to law enforcement officers who put their lives and safety on the line to protect the community.  On September 2, 2019, the defendant was arrested on multiple charges, including CPC § 21810 – Manufacture/Sale/Possession of Metal Knuckles, CPC § 243(c)(2) – Battery Against a Peace Officer who is engaged in the performance of duties, and various drug possession or purchase for sale charges.  *See* Koh Decl. ¶ 7, Ex. F (SFPD Incident Report

No. 190653749).  SFPD officers observed Ramos, whom they knew had multiple felony warrants for his arrest, in the area of 300 Golden Gate Avenue.  When they ordered Ramos to stop, Ramos ignored the officers' commands and continued to walk away on Golden Gate Avenue.  Next, when officers caught up to him, grabbed him by his backpack, and told him to stop, Ramos tried to take his arms out of the backpack straps.  Officers then physically grabbed Ramos by his arms, believing that he was attempting to flee.  At this point, Ramos locked him arms, broke free of the officers' hold, and struck one of the officers in the forehead with his elbow.  The officers overpowered Ramos and brought him to the ground.  A computer query revealed that Ramos had eight active arrest warrants and two active stay-away orders from the area.  Officers seized brass knuckles and 126 bindles of suspected narcotics, including fentanyl, methamphetamine, heroin, cocaine salt, and one rock of suspected methamphetamine weighing 7.9 grams. The defendant was ultimately convicted on one felony count of being an accessory in violation of CPC § 32.

The very next day after this arrest, on September 3, 2019, SFPD arrested the defendant again on almost identical charges, including battery against a police officer and manufacture/sale/possession of metal knuckles.  As the defendant has repeatedly demonstrated through his use of force against police officers during arrests for serious drug offenses and possession of weapons, the risk to public safety and to law enforcement are too severe to warrant his release.  The potential threat to Pretrial Services officers is also serious if he is placed under their supervision.  The defendant's numerous arrests for contempt and disobeying court orders also proves that he cannot and will not conform his behavior to court-imposed conditions of supervised release.

## 2.    The Defendant is a Flight Risk

No conditions of supervised release would assure the defendant's appearance for court hearings.  First, the defendant has every incentive to flee because if he is convicted he would face deportation to Honduras after serving any custodial sentence in the United States.  The defendant fled from an ICE Juvenile Facility on or about May 23, 2018, and he has been on the run ever since

Second, the defendant has no known employment, no assets, and no significant ties to the community to mitigate his flight risk.  His mother, father, and two siblings all live in Honduras.  He is unmarried, although he has been in a relationship with Tamela Gomez for one year, and he has no

children.  The defendant himself has only lived in the United States for two years.  Based on information provided by PG&E and the United States Postal Inspection Service ("USPIS"), there is no direct connection between the defendant and the Oakland address at which he resided prior to arrest.  Criminal records also reflect that the defendant has used six aliases and at least one alternate date of birth in the past.

Third, the defendant's risk of flight is not merely hypothetical.  On or about October 26, 2020, FBI agents followed the defendant as he drove towards San Rafael, California.  Shortly after entering the Richmond-San Rafael Bridge, the defendant crashed his car into a stalled vehicle on the Bridge.  The defendant then reversed and crashed into a second vehicle as the defendant tried to flee the accident scene.  The defendant continued to drive westbound on Interstate-580 and exited onto Andersen Drive in San Rafael, where he was stopped by the driver of the second vehicle he had impacted.  Within minutes of stopping on Andersen Drive, the defendant retrieved a backpack from his car and fled the scene on foot, abandoning his vehicle.  *See* Koh Decl. ¶ 2, Ex. A (Clemens Decl.) ¶ 13.  California Highway Patrol ("CHP") officers searched the abandoned vehicle and found narcotics paraphernalia and indicia in the front seat.  FBI agents and CHP officers were unable to find and arrest the defendant.

The defendant has also proven that he will continue to commit crimes while on release.  For example, on December 24, 2018, Ramos was arrested for possession of a controlled substance for sale, subject to an enhancing factor because he was on bail at the time of his arrest.  According to the SFPD police report, police officers observed the defendant in the vicinity of Golden Gate Avenue and Larkin Street.  *See* Koh Decl. ¶ 8, Ex. G (SFPD Incident Report No. 180967419).  The officers recognized the individual as Gustabo Ramos because they had received a department email a few weeks prior to the incident stating that an unknown Hispanic male adult was involved in selling fentanyl in the area of Golden Gate Avenue and Larkin Street.  The officers confirmed via a computer query performed by dispatch that Ramos had an active stay-away order from the area.  The defendant physically resisted the officers' attempts to handcuff him.  Officers recovered several bindles of suspected narcotics, including fentanyl, methamphetamine, and cocaine base.  They arrested the defendant for various drug possession with intent to distribute charges, as well as contempt/disobeying a court order and resisting arrest.  The

1   risk that the defendant will continue to traffic in fentanyl and other dangerous drugs in the Tenderloin

2   and commit other crimes are too great to warrant his release.

3        Finally, the government concurs with Pretrial Services's finding in its Pre-Bail Report that

4   Tamela Gomez is not a viable surety due to her uncertain immigration status.  Ms. Gomez is only 19

5   years old and she is studying for her GED.  She does not have her own home or other assets, and it is

6   unclear who else lives in the residence.  Given her own youth and the relatively short time they have

7   been dating, it is unreasonable to think that Gomez will have the requisite type of moral suasion over the

8   defendant.

9        **D.      The Risk that the Defendant May Contract COVID-19 at Santa Rita Jail Does
10             Not Warrant Pretrial Release**

11       While the current pandemic presents an unprecedented and tragic situation that is afflicting

12   everyone, COVID-19 does not change the Bail Reform Act's mandate of an "individualized evaluation

13   guided by the factors articulated in § 3142(g)" for determining whether a defendant should be granted

14   bail.  *Diaz-Hernandez*, 943 F.3d at 1199.   Nor does it alter the pretrial detention standard whereby the

15   Court must detain the defendant if it finds that the defendant is either a danger to the community or a

16   flight risk.

17       As other judges of this Court have found, the COVID-19 pandemic does not meaningfully shift

18   the balance of the § 3142(g) factors in defendant's favor.  *See, e.g.*, *United States v. Trujillo*, No. 20-cr-

19   00028-EJD-1 (SVK), Dkt. 15 (N.D. Cal. March 19, 2020) (rejecting a motion for release premised on

20   the emergence of COVID-19 because the existence and spread of COVID-19 did nothing to undermine

21   the Court's previous findings regarding risk of flight and danger to the community); *see also United*

22   *Sates v. Cazares*, No. 18-cr-00466-BLF-1, Dkt. 351 (N.D. Cal. Apr. 23, 2020) (concluding, in the pre-

23   trial detention context, that "the balancing of the factors does not warrant [defendant's] release [because

24   he] continues to pose a serious risk to the safety of the community, and that risk overrides [defendant's]

25   concerns that he might contract COVID-19 at [local jail]."); *United States v. Phillips*, No. 20-cr-00099-

26   JST-1, Dkt. 29 (N.D. Cal. Apr. 13, 2020) (rejecting motion for release under § 3142(i) and inability to

27   prepare defense due to COVID-19 because the existence and spread of COVID-19 did nothing to

28   undermine the Court's previous findings that defendant presents a danger to the community).

Consideration of the Section 3142(g) – which are unaffected by COVID-19 – compels this Court to conclude that Ramos remains a danger to the community and a flight risk and must therefore be detained pending trial.  Nothing about the COVID-19 pandemic reduces the danger that the defendant will commit another assault with a firearm, continue carrying firearms as a felon, or commit other crimes that violate the conditions of his supervised release.

Moreover, at this time, the Government is not aware of any facts (i.e., age or medical conditions) that would put the defendant at greater risk of developing serious illness due to COVID-19 were he to contract it.  The defendant is a healthy 22-year-old man with no known physical or mental health issues.

## CONCLUSION

Compliance with conditions, particularly the current shelter-in-place orders, is imperative during the public health emergency.  Because there are no conditions that can reasonably assure the safety of the community or adequately mitigate his flight risk, Gustabo Ramos should be detained pending trial.

DATED:  December 22, 2020                           Respectfully submitted,

                                                    DAVID L. ANDERSON
                                                    United States Attorney


                                                         /s/
                                                    _____
                                                    YOOSUN KOH
                                                    Assistant United States Attorney