DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

YOOSUN KOH (NYBN 5245220)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7034
    FAX: (415) 436-7234
    Yoosun.Koh@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> GUSTABO RAMOS, <br><br> Defendant. | CASE NO. 3:20-MJ-71799 MAG <br><br> UNITED STATES' MOTION TO <br> (1) REVOKE RELEASE ORDER AND ORDER DEFENDANT DETAINED <br> (2) TEMPORARILY STAY MAGISTRATE JUDGE'S ORDER GRANTING RELEASE <br><br> Judge: Hon. Edward J. Davila <br> Date: December 24, 2020 <br> Time: 3:00 p.m. |

I, JON CLEMENS, Special Agent with the Federal Bureau of Investigation declare as follows:

    1.    I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

    2.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since August 2014. I am currently assigned to the San Francisco Field Division in California. I successfully completed a five-month FBI New Agent Training Academy at the FBI Academy in

1  Quantico, Virginia.  This training included instruction in the investigation of federal drug violations,
2  including, but not limited to Title 21, United States Code Sections 841 and 846.  Additionally, this
3  training included several hundred hours of comprehensive, formalized instruction in, but not limited to,
4  narcotics investigations, drug identification, detection, interdiction, financial investigations and money
5  laundering, identification and seizure of drug related assets, undercover operations, and electronic and
6  physical surveillance procedures.

7       4.       During the course of my employment as a FBI Special Agent, I have participated in
8  numerous investigations either as a case agent or in a supporting role.  I have debriefed defendants,
9  confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking
10 organizations.  I also have participated in many aspects of drug investigations including, but not limited
11 to, undercover operations, telephone toll analysis, and records research, physical and electronic
12 surveillance.  I have assisted in court-ordered wiretap investigations, and I have participated in the
13 execution of several federal and state narcotics search and arrest warrants that resulted in the arrest of
14 suspects and seizure of narcotics.  In addition, I have attended seminars and courses on money
15 laundering and advanced financial and internet investigations related to drug trafficking.

16       5.       I have conducted and been involved in narcotics and financial investigations regarding
17 the unlawful manufacture, possession, distribution, and transportation of controlled substances, as well
18 as related money laundering statutes involving the proceeds of specified unlawful activities and
19 conspiracies associated with criminal narcotics.  In the course of these investigations, I have investigated
20 crimes in violation of Title 21, United States Code, Sections 841, 843, 846, 952, and 960, and Title 18,
21 United States Code, Sections 1956 and 1957.

22       6.       I have initiated and participated in approximately two Organized Crime Drug
23 Enforcement Task Force ("OCDETF") investigations.  The OCDETF program is part of the United
24 States Attorney General's strategy to reduce the availability of drugs by disrupting major trafficking
25 organizations through joint collaborations across agencies.  I have monitored, supervised, conducted
26 surveillance, or otherwise participated in several investigations that utilized electronic and/or wire
27 interceptions.  I have attended a training class focused on conducting electronic surveillance.  In the
28

course of working on investigations using electronic and/or wire interception, I have monitored, listened to, reviewed transcripts and/or "line sheets" of intercepted conversations. I estimate that the majority of these conversations involved the trafficking of methamphetamine and, cocaine, and heroin by Mexican DTOs, and that the majority of the narcotics trafficking conversations intercepted employed some form of code to thwart law enforcement.

7. Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of vehicles, mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of numerical codes and code words to conduct business. Also, I have become familiar with narcotics traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds. Furthermore, I have attended training and investigated cases involving the darknet, its vendors, and how those vendors utilize encrypted communication and the U.S. Postal Service to distribute narcotics.

8. Over the past five years, I have worked with other experienced agents, law enforcement officers and prosecutors on cases that apply the use of electronic surveillance to investigating defendants that are trafficking narcotics internationally and/or across multiple jurisdictions within the United States.

9. The facts in this declaration come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This declaration is intended to show merely that there is sufficient probable cause for detention and does not set forth all of my knowledge about this matter.

10. The conclusions and opinions set forth below are based on my experience and training as an FBI Special Agent, my direct participation in this investigation as described below, and conversations with other law enforcement officers who are familiar with the facts and circumstances of this investigation.

11. On September 30, 2020, FBI agents met with CW to develop more information regarding CW's second source of supply, **WILLIAM ("WILLIAM")**. CW described **WILLIAM** as a Honduran

male in his early 20s, approximately six feet tall, with a skinny build. CW provided "William's" telephone number as XXX-XXX-3639. CW indicated **WILLIAM** could be found dealing drugs nearly every night in the Tenderloin and that he sold fentanyl, cocaine, and methamphetamine in quantities as large as kilos. On or about October 7, 2020, agents directed CW to contact **WILLIAM** via text message and set up a purchase of four ounces of fentanyl that same evening.

12. On or around October 8, 2020, at approximately 7:20 p.m., agents conducted physical surveillance near the intersection of Franklin Street and Golden Gate Avenue in San Francisco and observed a dark colored Nissan Sedan ("Nissan"), California license plate XXX367, arrive in the vicinity of the intersection. Agents observed CW as he/she entered the front passenger seat of the Nissan to complete the controlled purchase of fentanyl. Following the purchase, CW confirmed that the driver of the Nissan was **WILLIAM**, the same **WILLIAM** that CW had purchased fentanyl from on numerous previous occasions. Following the purchase, CW relinquished 114.3 grams of a white powdery substance that presumptively tested positive for the properties of fentanyl.

13. On the evening of October 26, 2020, agents conducted physical surveillance of **WILLIAM** at his residence on Loma Vista Avenue, Oakland, California ("residence"). Agents followed **WILLIAM** in the known Nissan from his residence in Oakland northwest towards San Rafael, CA. Agents witnessed **WILLIAM** crash his known Nissan sedan into a stalled vehicle on the Richmond-San Rafael Bridge. Despite being in an accident, **WILLIAM** placed the Nissan into reverse and impacted a second vehicle behind him while attempting to flee the accident scene. Agents observed as **WILLIAM** traveled westbound on Interstate-580 being followed by the driver of the second vehicle. The Nissan exited onto Andersen Drive in San Rafael and pulled over with the second vehicle close behind. Agents identified **WILLIAM** as the driver of the Nissan as he stood outside the Nissan and spoke with the driver of the second vehicle. Agents contacted the California Highway Patrol ("CHP") and two officers were dispatched to the scene. As Officers of the CHP arrived on scene, **WILLIAM** retrieved a backpack from the Nissan and fled the scene on foot, abandoning his vehicle. Agents conducted an exhaustive search, however **WILLIAM** was not found.

14. On November 10, 2020, federal agents shared surveillance photos of **WILLIAM** with

officers of the San Francisco Police Department ("SFPD"), Tenderloin Station. SFPD officers positively identified **WILLIAM** as Gustabo Adolfo RAMOS (**RAMOS**), aka Gustabo Adolfo Ramos Hernandez, aka Carlos Cuevas-Ramos, date of birth November XX, 1998. According to SFPD, **RAMOS** had been arrested three times in San Francisco on charges related to narcotics possession with intent to distribute. During two of the arrests, **RAMOS** resisted police officers, and on one occasion he assaulted an officer. According to law enforcement records, **RAMOS** has three pending felony warrants for his arrest.

15. Further checks with federal partner agencies revealed an individual named GUSTABO **RAMOS**, date of birth November XX, 1998 had been apprehended by U.S. Border Patrol on or about May 13, 2018 while attempting to transit the U.S. border illegally.

16. On December 7, 2020, at approximately 7:15 p.m., CW met with agents in order to conduct a second controlled purchase of fentanyl from **RAMOS** for $3000. Agents observed **RAMOS** as he parked a BMW sedan ("BMW") next to CW. CW entered the BMW and exited shortly thereafter. After procuring the fentanyl, CW met with agents where he relinquished two small plastic bags of narcotics containing approximately 94.4 grams of a white powdery substance that presumptively tested positive for the properties of fentanyl.

17. On December 10, 2020, agents executed a Federal Search Warrant and Arrest Warrant at **RAMOS**'s residence, located on Loma Vista Avenue, Oakland, CA. During the execution of the warrant, after knocking and announcing the presence of federal agents, **RAMOS** refused to answer the front door forcing agents to execute a breach of the front security gate and front door. During the protective sweep of the residence, agents continued to announce their presence and identified a locked door at the end of the main hallway. After functioning the handle without gaining entry, agents realized that **RAMOS** had barricaded himself behind the locked door. After several attempts, agents successfully breached the locked door and encountered **RAMOS** in the bathroom with a backpack. **RAMOS** was non-compliant and failed to raise his hands at agent's commands; however, agents successfully hand-cuffed him without incident.

18. After securing the scene, agents conducted a thorough search of the residence at which time they located and seized an assault rifle and three high-capacity magazines (two of which contained

ammunition in excess of ten rounds). Agents trained in the examination of firearms described the rifle as an AR-15 style rifle meant to fire 7.62mm caliber rounds, which is a military-grade ammunition round. Additionally, the rifle maintained no legitimate serial number or manufacturer markings as required by federal law. Database queries for the number "AR001", which was stamped on the receiver, produced negative results for sales and ownership. I know from my training and experience that firearms without required markings are known as "Ghost Guns." Ghost Guns are not manufactured commercially, bear no markings, require no background check, require personal assembly, and are often the result of a private-party sale. Furthermore, I know from my training and experience that Ghost Guns are often purchased by criminals in order to evade criminal history checks normally required at the time of purchase. Furthermore, **RAMOS** is an illegal alien so he is prohibited from owning a firearm.

19. During the execution of the search, agents accessed the backpack that **RAMOS** had with him in the bathroom at the time of his arrest. Inside the backpack agents identified numerous types of narcotics to include fentanyl, methamphetamine, crack-cocaine, and fraudulent pills. Regarding fentanyl, there were several clear bags of the substance that were colored white, green, and pink. I know from my training and experience that fentanyl can be produced in different ways in order to be utilized in different methods (e.g. smoking, injection, or inhaled). Agents seized approximately 382.8 grams of different colored powdery substances that presumptively tested positive for the properties of fentanyl[1]. Additionally, agents seized approximately 240.6 grams of a crystalline substance that presumptively tested positive for the properties of methamphetamine.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and accurate to the best of my knowledge.

Executed this 22nd day of December, in San Francisco, California.

/s/ Jon Clemens
JON CLEMENS
Special Agent
Federal Bureau of Investigation

---

[1] The brown plastic bag could not be tested due to dangers of the color with respect to fires caused by use of the Trunarc handheld ramen spectrometer narcotics analyzer. However, I know from my experience that brown-colored fentanyl is often sold by narcotics traffickers.